INMAN, Judge.
 

 The North Carolina Industrial Commission (the "Commission") did not err in finding that an employee's last injurious exposure to asbestos, which contributed to his development of an occupational disease, occurred during the thirty years he worked for his primary lifetime employer, based on the testimony of his former co-workers and medical experts, and in the absence of any evidence that he was exposed to asbestos at any subsequent job. Nor did the Commission err in calculating the employee's average weekly wage based upon the employee's earnings in the year immediately preceding his diagnosis.
 

 This case arises out of a workers' compensation claim filed by Johnny Ray Penegar ("Decedent") against United Parcel Service ("Employer" or "UPS") and Liberty Mutual Insurance Company ("Carrier") (collectively "Defendants"), asserting compensation for Decedent's mesothelioma. Carra Jane Penegar ("Plaintiff"), Decedent's wife and executrix of his estate, was substituted as Plaintiff following Decedent's death on 26 March 2015 during the pendency of this action. Both parties appeal from the opinion and award of the Full North Carolina Industrial Commission, which awarded Plaintiff compensation for all of Decedent's medical expenses associated with his diagnosis of mesothelioma, total disability compensation, burial expenses, and death benefits.
 

 Defendants argue that the Commission's findings that Plaintiff was injuriously exposed to asbestos while employed by UPS and that Plaintiff's last injurious exposure to asbestos occurred at UPS are unsupported by competent evidence.
 

 Plaintiff argues that the Commission lacked jurisdiction to revise the Deputy Commissioner's calculation of the average weekly wage, and, assuming jurisdiction, that the Commission's calculation was incorrect. Additionally, Plaintiff asserts that the Commission failed to address the issue, raised by Plaintiff on appeal from the Deputy Commissioner's opinion and award, of the appropriate maximum compensation rate to be applied to Decedent's claim. After careful review, we affirm the Commission's finding that Decedent's last injurious exposure to asbestos occurred while Decedent was employed with UPS. We also affirm the Commission's recalculation of Decedent's average weekly wage. We dismiss as moot Plaintiff's appeal from the Commission's failure to address the Deputy Commissioner's calculation of the maximum compensation rate.
 

 Factual and Procedural History
 

 Decedent worked for UPS for thirty years, from 1967 until 1998, as a feeder driver based in UPS's Charlotte facility. Decedent's duties included driving a tracker-trailer to destinations within 200 miles and back each day. The Charlotte facility was a large, open building approximately the size of two or three football fields, in which the main area, referred to by employees as the "shop," consisted of various unseparated bays designated "tractor shop" or "package car shop" depending on what vehicles were being repaired or maintained in each. Decedent walked through the shop nearly every day to get from his truck to the employee locker room. Decedent would often stop in the shop to talk with mechanics while they worked.
 

 UPS employed its own mechanics to service the vehicles in its fleet during the entirety of Decedent's employment. Standard service tasks included maintaining and repairing brakes. In any given week, between three and seven brake jobs were performed in the shop. A typical brake job included banging the brake drums on the ground and using compressed air to clear off the brake dust.
 

 *394
 
 The brake pads used by UPS during Decedent's employment contained asbestos, and would release asbestos fibers into the air during brake jobs. Starting in the mid-1980s, UPS provided protective masks to the mechanics, but did not at any time provide a protective mask to Decedent.
 

 Following his employment with UPS, from 1999 until 2002, Decedent drove a transfer van for Union County. He also worked for a church and for Union County Schools. Decedent continued to work part-time until 2012.
 

 On 8 February 2013, Decedent was diagnosed with mesothelioma. Prior to his death on 26 March 2016, Decedent filed a claim with the Commission alleging that his mesothelioma developed as a result of asbestos exposure during his employment with UPS.
 

 Plaintiff presented testimony from two former UPS mechanics and two medical experts. The mechanics testified that asbestos was present at the Charlotte facility. The medical experts testified that exposure to asbestos in the UPS facility caused Decedent to develop mesothelioma or contributed to him developing that disease. Defendants presented two expert witnesses-an expert in industrial hygiene and an expert in pathology.
 

 The Deputy Commissioner issued an opinion and award finding that Decedent was last injuriously exposed to asbestos, and the hazards of developing mesothelioma, during his employment with UPS. The Deputy Commissioner awarded Plaintiff 500 weeks of wage compensation, calculated using Decedent's average weekly wage from 1998 of $690.10, the last year he worked for UPS, and limited by the maximum compensation rate for 1998, so that Plaintiff was awarded $532.00 per week. The opinion and award also compensated Plaintiff for the medical expenses incurred treating Decedent's mesothelioma.
 

 Plaintiff filed a motion for reconsideration of the maximum compensation rate, arguing that the Deputy Commissioner should have used the maximum compensation rate from 2015-the date of Decedent's death. The Deputy Commissioner denied Plaintiff's motion.
 

 Both parties appealed to the Full Commission. Defendants challenged a majority of the Deputy Commissioner's findings of fact and all but one of the conclusions of law. Plaintiff challenged only the Deputy Commissioner's calculation of the appropriate maximum compensation rate.
 

 The Commission, on 8 December 2016, issued its opinion and award finding that Decedent's last injurious exposure to asbestos, and the hazards of mesothelioma, occurred while he was employed with UPS. The Commission recalculated and substantially reduced Decedent's average weekly wage, based on Decedent's earnings in the year prior to his diagnosis with mesothelioma, when he was no longer employed by UPS. Both parties appealed.
 

 Analysis
 

 I. Standard of Review
 

 "Appellate review of an award from the Industrial Commission is generally limited to two issues: (i) whether the findings of fact are supported by competent evidence, and (ii) whether the conclusions of law are justified by the findings of fact."
 
 Chambers v. Transit Mgmt.
 
 ,
 
 360 N.C. 609
 
 , 611,
 
 636 S.E.2d 553
 
 , 555 (2006) (citation omitted). Unchallenged findings of fact are presumed to be supported by competent evidence, and findings of fact supported by competent evidence are binding on appeal.
 
 Chaisson v. Simpson
 
 ,
 
 195 N.C. App. 463
 
 , 470,
 
 673 S.E.2d 149
 
 , 156 (2009). The Commission's conclusions of law are reviewed
 
 de novo
 
 .
 
 McRae v. Toastmaster, Inc.
 
 ,
 
 358 N.C. 488
 
 , 496,
 
 597 S.E.2d 695
 
 , 701 (2004).
 

 II. Defendants' Appeal
 

 Defendants challenge the Commission's findings that (1) the brakes used by UPS at its Charlotte facility while Decedent was employed there contained asbestos and (2) Decedent was at an increased risk of asbestos exposure during his employment with UPS. Defendants also argue that Plaintiff failed to present evidence that Decedent was not exposed to asbestos during his subsequent employments, and therefore, the Commission's finding that Decedent's
 
 last
 
 injurious exposure to asbestos occurred at UPS is also unsupported by the evidence. We disagree.
 

 *395
 

 A. Injurious Exposure
 

 Defendants challenge the following findings of fact made by the Full Commission:
 

 9. Vernon Thomas Pond worked as a mechanic for defendant-employer from 1972 to 2003 in the same facility as decedent. Mr. Pond testified, based upon his work and experience as a mechanic, that all brake shoes he worked on while employed by defendant-employer contained asbestos.
 

 10. Bobby Bolin also worked for defendant-employer in mechanics, mostly performing maintenance on tractors and trailers. He began working for defendant-employer in or about 1967. Mr. Bolin testified that the work environment was "pretty dusty" and, even though he knew brakes contained asbestos as early as 1967, he was not aware that asbestos dust "was bad" until the mid-1980s. Mr. Bolin testified that defendant-employer provided mechanics with masks to protect against dust exposure in the mid-1980s and restricted the blowing of dust in the shop, but other employees walking through the shop were not provided with protective masks.
 

 ...
 

 12. Based upon the preponderance of the evidence in view of the entire record, the Commission finds that the brakes utilized by defendant-employer in the maintenance of its trucks, tractors, and trailers contained asbestos. The competent and credible evidence of record demonstrates that such brakes contained asbestos from the mid-1960s until at least the mid-1980s and, to the extent the brakes continued to contain asbestos from the mid-1980s until decedent's retirement, decedent was not supplied with a protective mask to curtail his exposure to asbestos fibers while in the shop.
 

 ...
 

 23. Dr. Harpole testified that, although decedent did not have "a giant exposure" to the hazards of asbestos like someone who worked in an asbestos factory, being around aerosolized asbestos in the air daily, or even every few days over a period of years, led to significant asbestos exposure for decedent when he walked through defendant-employer's shop.
 

 24. Dr. Harpole testified that decedent's mesothelioma was caused by exposure to asbestos and, more likely than not, that decedent's work for defendant-employer caused or significantly contributed to his development of mesothelioma. He further testified that decedent's exposure to asbestos in his employment with defendant-employer placed him at an increased risk, over that faced by the general public, for developing mesothelioma.
 

 25. Dr. Harpole's opinions on causation and increased risk were based on his understanding that, although decedent did not perform brake work for defendant-employer, he did walk through the shop daily or every few days over the period of many years while brake jobs were being performed and brake dust was aerosolized. Dr. Harpole testified that if the mechanics were not "grinding" brakes, then it would make the causation and increased risk less likely, however, Dr. Harpole testified that, even if defendant-employer's mechanics did not grind brakes, the use of compressed air aerosolized the asbestos fibers in the brakes, which would have been the key to decedent's exposure.
 

 26. From 1957 until 1960, decedent served in the U.S. Navy as a machinist mate aboard a ship, the U.S.S. Uhlmann, and was likely exposed to the hazards of asbestos during that time. However, Dr. Harpole testified that decedent likely had a protracted exposure over time, which he explained "is much more of a risk for forming cancer than one giant exposure." Dr. Harpole further explained that the amount of plaque in decedent's lungs suggested a longer-term exposure than what decedent would have experienced during his three to four years in the Navy.
 

 ...
 

 28. Dr. Barry Horn is a pulmonologist and critical care specialist with experience evaluating and treating asbestos-related diseases, including mesothelioma. Plaintiff tendered Dr. Horn as an expert in pulmonary medicine and asbestos-related diseases, including mesothelioma, without objection
 
 *396
 
 from defendants. Dr. Horn never personally evaluated decedent, but reviewed the medical records and deposition testimony related to this case and generated a written report summarizing his conclusions and opinions.
 

 29. Dr. Horn understood that decedent incurred asbestos exposure in his employment with defendant-employer when he walked through the maintenance areas of the shop twice each work day, when he presented for work and then when he left work at the end of his shift, over a period of decades. Dr. Horn further understood that the brake work in the shop decedent walked through did not involve "grinding," but replacement work that would release asbestos fibers into the air for prolonged periods of time.
 

 30. Dr. Horn testified that, "to get mesothelioma, it requires remarkably little exposure to asbestos." Dr. Horn explained that, even though residual brake dust contains anywhere between 1 and 10 percent of asbestos, that amount is still significant enough to cause mesothelioma. Dr. Horn testified, "When you blow out the dust, we're talking about a lot of fibers in the air, so even if it's one percent or less [than] one percent, we're talking about a lot of fibers now."
 

 31. Dr. Horn testified that an individual's risk for developing asbestos-related illness is dose dependent, meaning "[t]he more asbestos you inhale and retain in your lungs, the more likely you'll develop an asbestos-related illness and that includes mesothelioma." Dr. Horn explained that, because decedent walked back and forth in defendant-employer's premises and breathed asbestos fibers as a consequence of his job over a period of decades, his exposure to asbestos was a substantial contributing factor in his risk for developing mesothelioma.
 

 32. Dr. Horn further testified that decedent's employment with defendant-employer placed him at an increased risk, over that faced by the general public, for the development of mesothelioma, because "the general public is not exposed to levels of asbestos that would have existed in [defendant-employer's] facility" where brake repair was being performed.
 

 ...
 

 35. There was no question for Dr. Horn that the brake linings defendant-employer used in the 1960s, '70s, and '80s contained chrysotile asbestos. As he testified, these brake linings may also have contained the more potent form of tremolite, or amphibole, asbestos. Dr. Horn reviewed several publications during the course of his deposition that concluded that, regardless of whether brake linings contained amphibole asbestos, or only chrysotile asbestos, exposure to the asbestos dust of either form could cause mesothelioma, and he agreed with those conclusions. Dr. Horn also explained that all government agencies in the United States take the position that chrysotile asbestos, alone, can cause mesothelioma, and that the doses of chrysotile do not have to be extremely high to do so.
 

 36. As to "background" asbestos exposures, Dr. Horn agreed with Dr. Harpole that everyone receives some level of exposure, but testified that in order for him to conclude that someone has asbestos-related disease, their asbestos exposure has to be greater than background exposure.
 

 37. Dr. Horn testified, and the Commission finds as fact, that decedent was clearly exposed to hazardous levels of asbestos during his Navy service, but decedent continued to have asbestos exposure thereafter while working for defendant-employer, and it was the latter exposure that either caused or substantially contributed to decedent's development of mesothelioma.
 

 ...
 

 47. Dr. Roggli testified that the brake products that were likely in use by defendant-employer during decedent's employment contained chrysotile asbestos, but it was his opinion that chrysotile asbestos from friction products could not cause mesothelioma. Dr. Roggli did allow, though, that exposure to chrysotile mined from Canada, which generally is contaminated with tremolite (a more potent amphibole type of asbestos) could cause mesothelioma.
 

 ...
 

 *397
 
 50. The Commission accords greater weight to the causation and increased risk opinions of Dr. Harpole and Dr. Horn over that of Mr. Agopsowicz and Dr. Roggli. Drs. Harpole and Horn have extensive experience specializing in the diagnosis and treatment of mesothelioma. Dr. Harpole served as decedent's treating physician, which afforded him an opportunity to discuss directly with decedent his lifetime exposures to asbestos, and to form his opinions on causation and increased risk therefrom. Further, the Commission finds Dr. Horn's opinions are well-reasoned, supported by research and a lifetime of study in the field of pulmonology, and in accord with those opinions of Dr. Harpole.
 

 51. The Commission finds Dr. Roggli's opinions regarding an individual's cumulative exposures to asbestos and risk of developing mesothelioma contradictory when applied to decedent specifically and, therefore, assigns little weight to the expert opinions of Dr. Roggli. The Commission also assigns little weight to the testimony of Mr. Agopsowicz, who admits he is not qualified to render an opinion on causation in connection with decedent's development of mesothelioma.
 

 52. The preponderance of the evidence in view of the entire record establishes that decedent was exposed to greater than background levels of asbestos during his service in the Navy in the 1950s and throughout his employment with defendant-employer from 1967 through 1998.
 

 53. Based on the preponderance of the evidence in view of the entire record, the Commission finds that decedent's last injurious exposure to the hazards of asbestos occurred during his employment with defendant-employer.
 

 54. The preponderance of the evidence in view of the entire record establishes that decedent's work for defendant-employer exposed him to a greater risk of contracting mesothelioma over the general public, due to his above-background levels of asbestos exposure in the course of his employment, and that such exposure was a significant contributing factor to his development of mesothelioma.
 

 55. The preponderance of the evidence in view of the entire record further establishes that mesothelioma caused or significantly contributed to decedent's death.
 

 Defendants' challenge to the weight the Commission assigned to testimony is beyond our scope of review.
 
 See
 

 Adams v. AVX Corp.
 
 ,
 
 349 N.C. 676
 
 , 681,
 
 509 S.E.2d 411
 
 , 414 (1998) ("[O]n appeal, this Court 'does not have the right to weigh the evidence and decide the issue on the basis of its weight. The court's duty goes no further than to determine whether the record contains any evidence tending to support the finding.' " (quoting
 
 Anderson v. Lincoln Const. Co.
 
 ,
 
 265 N.C. 431
 
 , 434,
 
 144 S.E.2d 272
 
 , 274 (1965) ) ). Instead, we review the challenged findings only to determine whether they are supported by competent evidence.
 
 Adams
 
 ,
 
 349 N.C. at 681
 
 ,
 
 509 S.E.2d at 414
 
 .
 

 The Commission's findings are consistent with the witnesses' testimonies and therefore are supported by competent evidence. Mr. Pond testified that he worked with UPS as a mechanic at the Charlotte facility from 1972 until 2003. He further testified that it was his knowledge that all brake pads, including those used by UPS during Decedent's employment, contained asbestos, and that it was common practice for the mechanics to knock the brake drums on the floor and to use compressed air to clean the brake dust from the drums. Mr. Bolin testified that it was his understanding that the brake pads used by UPS contained asbestos, and that it was not until the 1980s that UPS began providing protective masks-and then only to the mechanics. Both witnesses testified that they frequently saw Decedent in the shop where these brake jobs were performed. Based on this testimony alone, the Commission's findings that (1) the brakes used by UPS during Decedent's employment contained asbestos and (2) Decedent was exposed to increased levels of asbestos beyond that of the general public are supported by competent evidence.
 

 The testimonies of Drs. Harpole and Horn, the medical experts called by Plaintiff, also provide competent evidence to support the Commission's findings of fact. Defendants argue that their expert witnesses, Mr. Agopsowicz and Dr. Roggli, offered testimony that
 
 *398
 
 contradicts the testimony of Plaintiff's witnesses. However, as we mentioned above, it is not within this Court's authority to reweigh the evidence and credibility of the witnesses. The Commission explicitly found that Plaintiff's expert witnesses presented more credible testimony than Defendants' expert witnesses, and, because the Commission is the sole judge of credibility, the Commission's findings must stand.
 
 See, e.g.,
 

 Adams
 
 ,
 
 349 N.C. at 680
 
 ,
 
 509 S.E.2d at 413
 
 ("The Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony." (citation omitted) ).
 

 Accordingly, we hold that the Commission's findings that while employed with UPS, Decedent was exposed to asbestos at levels above those of the general public and was injured as a result are supported by competent evidence.
 

 B. Last Injurious Exposure
 

 Defendants also challenge the Commission's finding that Decedent's last injurious exposure occurred while Decedent was employed by UPS.
 

 "In any case where compensation is payable for an occupational disease, the employer in whose employment the employee was
 
 last injuriously exposed
 
 to the hazards of such disease, and the insurance carrier, if any, which was on the risk when the employee was so last exposed under such employer, shall be liable."
 
 N.C. Gen. Stat. § 97-57
 
 (2015) (emphasis added). The North Carolina Supreme Court, in
 
 Rutledge v. Tultex Corp.
 
 ,
 
 308 N.C. 85
 
 ,
 
 301 S.E.2d 359
 
 (1983), explained that "[t]he statutory terms 'last injuriously exposed' mean 'an exposure which proximately augmented the disease to any extent, however slight.' "
 
 308 N.C. at 89
 
 ,
 
 301 S.E.2d at 362-63
 
 (citation omitted). Therefore, the Court concluded that to succeed, a plaintiff need only show: "(1) that she has a compensable occupational disease and (2) that she was 'last injuriously exposed to the hazards of such disease' in [the] defendant's employment."
 
 Id.
 
 at 89,
 
 301 S.E.2d at 362
 
 .
 

 The Commission found that "[t]here is no evidence of record that any of [Decedent's subsequent] jobs exposed decedent to the hazards of asbestos." Defendants concede that, as written, this finding is factually true. We note that this finding, in turn, is logically consistent with the Commission's finding that Decedent's last injurious exposure to asbestos occurred at UPS-because if there is no evidence of later exposure, the last exposure must necessarily have occurred at UPS.
 

 Defendants argue that it is precisely because there is no evidence of record regarding Decedent's asbestos exposure at his subsequent employment that the Commission erred in finding that "decedent's last injurious exposure to the hazards of asbestos occurred during his employment with defendant-employer." Defendants argue that Plaintiff failed to carry the burden to present evidence that Decedent was not exposed to asbestos in his employment subsequent to his employment with UPS.
 

 Defendants' argument is premised on the theory that in order for the Commission to find that Decedent's last exposure was at UPS, it must first find, based on specific evidence presented by Plaintiff, that Decedent was not later exposed at his subsequent employers. We reject this argument based upon precedent and the legislative purpose of the Workers' Compensation Act.
 

 Our courts have consistently held that the Workers' Compensation Act "should be liberally construed so that the benefits under the Act will not be denied by narrow, technical or strict interpretation."
 
 Stevenson v. City of Durham
 
 ,
 
 281 N.C. 300
 
 , 303,
 
 188 S.E.2d 281
 
 , 283 (1972) (citation omitted). Moreover, the purpose of the "last injurious exposure" doctrine is "to eliminate the need for complex and expensive litigation of the issue of relative contribution by each of several employments to a plaintiff's occupational disease."
 
 City of Durham v. Safety Nat. Cas. Corp.
 
 ,
 
 196 N.C. App. 761
 
 , 764,
 
 675 S.E.2d 393
 
 , 395 (2009). The doctrine provides a plaintiff with a reduced burden by requiring only a showing that the occupational exposure augmented a disease, "however slight[,]" as opposed to demonstrating how much each exposure resulted in the disease.
 
 See
 

 Rutledge
 
 ,
 
 308 N.C. at 89
 
 ,
 
 301 S.E.2d at 362
 
 .
 

 Defendants' assertion that the Commission's finding is not supported by the evidence
 
 *399
 
 misreads the Commission's finding. The Commission found that there was no evidence that Decedent was exposed to asbestos during his subsequent employment, not, as Defendants argue, that there was no evidence regarding Decedent's exposure during his subsequent employment. This distinction, however minor, is essential, as we are bound by the Commission's findings when those findings are supported by the evidence in the record. Here, the Commission's finding that there is no evidence that Decedent was exposed to asbestos is supported by the record because there is no evidence that he was exposed to asbestos. Moreover, this finding supports the Commission's finding that Decedent's last injurious exposure to asbestos was while he was employed by UPS.
 

 In sum, we hold that in the absence of evidence that an employee was exposed to a hazardous material at subsequent employers, the burden shifts to the employer to produce some evidence of a subsequent exposure. Shifting the burden of production does not shift the burden of proof. But before the Commission can find that an employee was exposed to a hazardous condition at some subsequent employment, the record must include some evidence of exposure in that employment.
 

 In
 
 Hardin v. Motor Panels, Inc.
 
 ,
 
 136 N.C. App. 351
 
 ,
 
 524 S.E.2d 368
 
 (2000), the plaintiff worked as a typist from 1988 until 1993 for the defendant-employer, during which time she began suffering from symptoms associated with overuse tendinitis of the arms.
 
 Id.
 
 at 352,
 
 524 S.E.2d at 370
 
 . The plaintiff resigned from her position and worked in several subsequent jobs, including at a department store, a fast food restaurant, and a gas and convenience store.
 
 Id.
 
 at 352-53,
 
 524 S.E.2d at 370
 
 . Our Court held that the evidence in the record-the plaintiff's job duties, medical evidence indicating a worsening of her condition, and the plaintiff's own testimony that her symptoms were aggravated by her subsequent jobs-supported the Commission's finding that her last injurious exposure to carpal tunnel syndrome occurred while she worked with her subsequent employers, not while she worked with the defendant-employer.
 
 Id.
 
 at 359-60,
 
 524 S.E.2d at 374
 
 .
 

 In contrast to
 
 Hardin
 
 , this Court in an unpublished decision,
 
 Richardson v. PCS Phosphate Co.
 
 ,
 
 238 N.C. App. 198
 
 ,
 
 768 S.E.2d 64
 
 ,
 
 2014 WL 7149777
 
 (2014) (unpublished), affirmed an opinion and award of the Commission finding that a plaintiff's last injurious exposure to asbestos, which resulted in his diagnosis of mesothelioma, occurred during his time with the defendant-employer ("PCS") and not at his subsequent employment ("East Group"). The plaintiff worked for the defendant-employer, a phosphate products manufacturer, as a concentrator engineer before eventually rising to the rank of assistant mine manager.
 

 Id.
 

 at *1-*2. The only finding by the Commission addressing the plaintiff's subsequent employer stated:
 

 After retiring from PCS, [the] [p]laintiff began working for the East Group in 1995 on the same PCS job site. [The] [p]laintiff testified that in this position, he performed the same job duties as he had while employed as Assistant to the Mine Manager. [The] [p]laintiff does not believe that he was injuriously exposed to the hazards of asbestos while working for the East Group.
 

 Id.
 
 at *8. Our Court explained that "[b]esides [the] plaintiff's own testimony that he performed essentially the same work at the same locations, there was no evidence presented as to whether asbestos was still present in the areas that [the] plaintiff visited while working for the East Group, whether there was asbestos maintenance or abatement projects going on after 1995, whether [the] plaintiff's activities in those same areas could have exposed him to asbestos after 1995, and no expert medical evidence linking [the] plaintiff's work at the East Group with his mesothelioma."
 
 Id.
 
 at *8. This Court held, in the absence of evidence "establishing the nexus between [the] plaintiff's continuing work at the PCS facility for the East Group and exposure to asbestos[,] ... we are unable to conclude that the Full Commission erred in failing to find that [the] plaintiff's 'last injurious exposure' occurred while he was working for the East Group."
 
 Id.
 
 at *8. Defendants' appeal here, as the appeal in
 
 Richardson
 
 , challenges the Commission's finding that a plaintiff's last injurious exposure
 
 *400
 
 occurred with the defendant-employers. While
 
 Richardson
 
 is not binding authority, given the paucity of decisions regarding the issue before us, its reasoning is persuasive.
 

 The purpose of the Workers' Compensation Act and our precedent support the Commission's finding that, in the absence of evidence that Decedent was exposed to asbestos or any other substance causing mesothelioma during his subsequent employment, Decedent's last injurious exposure to asbestos occurred at UPS. To require a plaintiff to present affirmative evidence that no exposure existed during all subsequent employment would impose a burden in stark conflict with purpose of the last injurious exposure doctrine and the general purpose of the Workers' Compensation Act.
 

 Here, Plaintiff provided competent evidence that Decedent was injuriously exposed to asbestos during his employment with UPS and that his exposure contributed to his development of mesothelioma. While there is no affirmative evidence proving a lack of exposure to asbestos in his subsequent employment, nothing in the evidence regarding his subsequent employment-as a van driver and a church and school employee-suggests any inference to the contrary. Without any such evidence, it would have been error for the Commission to find that Decedent was later exposed.
 

 We recognize that it is a plaintiff's burden to prove his claim is compensable,
 
 see
 

 Henry v. A.C. Lawrence Leather Co.
 
 ,
 
 231 N.C. 477
 
 , 479,
 
 57 S.E.2d 760
 
 , 761 (1950), and hold that under the facts presented, Plaintiff has done so. Based on the record, and in the absence of any evidence establishing a nexus between Plaintiff's subsequent employment and asbestos exposure, we conclude the Commission did not err in finding that Plaintiff's last injurious exposure to asbestos was at UPS.
 

 III. Plaintiff's Appeal
 

 Plaintiff argues that the Commission lacked jurisdiction to revise a determination made by a Deputy Commissioner in an opinion and award, when that issue was not raised by either party, and, assuming jurisdiction, that the Commission erred in calculating Plaintiff's average weekly wage and maximum compensation rate. We hold the Commission had jurisdiction and properly calculated Plaintiff's average weekly wage, but did not make a determination as to the proper maximum compensation rate.
 

 A. Jurisdiction to Revise an Opinion and Award
 

 It is well-established in North Carolina that the Industrial Commission has the authority to review, modify, adopt, or reject the findings of fact found by a deputy commissioner.
 
 Brewer v. Powers Trucking Co.
 
 ,
 
 256 N.C. 175
 
 , 182,
 
 123 S.E.2d 608
 
 , 613 (1962). The Commission also has "the power to review the evidence, reconsider it, receive further evidence, rehear the parties or their representatives, and, if proper,
 
 to amend the award
 
 ...."
 
 Id.
 
 at 182,
 
 123 S.E.2d at 613
 
 (emphasis added). Inherent in these powers, our courts have long recognized the Full Commission's authority to "strike [a] deputy commissioner's findings of fact even if no exception was taken to the findings."
 
 Keel v. H & V Inc.
 
 ,
 
 107 N.C. App. 536
 
 , 542,
 
 421 S.E.2d 362
 
 , 367 (1992).
 

 Plaintiff argues that this Court's recent holding in
 
 Reed v. Carolina Holdings
 
 , --- N.C. App. ----,
 
 796 S.E.2d 102
 
 (2017), restricts the scope of issues the Commission may address on appeal from a deputy commissioner's opinion and award. In
 
 Reed
 
 , we held that pursuant to Rule 701 of the North Carolina Industrial Commission we were without jurisdiction to address an argument raised, for the first time on appeal, by the defendant.
 

 Id.
 

 at ----,
 
 796 S.E.2d at 108
 
 . This holding, however, refers only to this Court's jurisdiction to hear arguments not asserted, or ruled upon, below; it does not address
 
 the Commission's
 
 authority to review, modify, or amend a deputy commissioner's opinion and award when an issue is not raised by the parties. The Commission's authority under the Rules promulgated by the Commission has previously been addressed by the North Carolina Supreme Court. In
 
 Brewer
 
 , the Court explained that "these rules do not limit the power of the Commission to review, modify, adopt, or reject the findings of fact found by a Deputy Commissioner...."
 

 *401
 

 256 N.C. at 182
 
 ,
 
 123 S.E.2d at 613
 
 . Accordingly, we hold that the Commission was well within its authority and therefore had jurisdiction to amend an aspect of the Deputy Commissioner's opinion and award, even those not raised by either party on appeal.
 

 B. Average Weekly Wage
 

 "The determination of the plaintiff's 'average weekly wages' requires application of the definition set forth in the Workers' Compensation Act, and the case law construing that statute[,] and thus raises an issue of law, not fact."
 
 Boney v. Winn Dixie, Inc.
 
 ,
 
 163 N.C. App. 330
 
 , 331-32,
 
 593 S.E.2d 93
 
 , 95 (2004) (internal quotation marks and citations omitted). We therefore review the Commission's calculation of Decedent's average weekly wages
 
 de novo
 
 .
 
 Id.
 
 at 331-32,
 
 593 S.E.2d at 95
 
 .
 

 Section 97-2(5) of the North Carolina General Statutes" 'provides a hierarchy' of five methods of computing the average weekly wages[.]"
 
 McAninch v. Buncombe Cty. Schools
 
 ,
 
 347 N.C. 126
 
 , 130,
 
 489 S.E.2d 375
 
 , 378 (1997) (citation omitted). "The five methods are ranked in order of preference, and each subsequent method can be applied only if the previous methods are inappropriate."
 
 Tedder v. A & K Enterprises
 
 ,
 
 238 N.C. App. 169
 
 , 174,
 
 767 S.E.2d 98
 
 , 102 (2014) (citation omitted). Section 97-2(5) states in relevant part:
 

 [Method 1] "Average weekly wages" shall mean the earnings of the injured employee in the employment in which the employee was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury, ... divided by 52;
 

 ...
 

 [Method 2] if the injured employee lost more than seven consecutive calendar days at one or more times during such period, although not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks remaining after the time so lost has been deducted.
 

 ...
 

 [Method 3] Where the employment prior to the injury extended over a period of fewer than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will be thereby obtained.
 

 ...
 

 [Method 4] Where, by reason of a shortness of time during which the employee has been in the employment of his employer or the casual nature or terms of his employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury was being earned by a person of the same grade and character employed in the same class of employment in the same locality or community.
 

 ...
 

 [Method 5] But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.
 

 N.C. Gen. Stat. § 97-2
 
 (2015). "The final method, as set forth in the last sentence, clearly may not be used unless there has been a finding that unjust results would occur by using the previously enumerated methods."
 
 McAninch
 
 ,
 
 347 N.C. at 130
 
 ,
 
 489 S.E.2d at 378
 
 (citation omitted).
 

 The first three methods calculate the average weekly wages for an employee based on the employee's actual employment with the employer in the 52-week time period immediately preceding the date of injury. Here, the Commission determined, and we agree, that these methods are inappropriate because of the length of time between Decedent's employment and his diagnosis. The Commission found that Decedent's date of injury
 
 [1]
 
 was 8 February 2013, and that Decedent
 
 *402
 
 had not worked for UPS at any time in the 52 weeks immediately prior this date.
 

 Regarding the fourth method, the Commission found that "[t]he record contains no evidence by which calculation of decedent's average weekly wage can be made...." This determination makes sense because the fourth method applies to employees who worked for only a short time for the defendant employer. Decedent worked for UPS for thirty years and had not worked for them in the fifteen years immediately prior to his diagnosis.
 

 The Commission then found, consistent with the requirements of
 
 McAninch
 
 ,
 
 347 N.C. at 130
 
 ,
 
 489 S.E.2d at 378
 
 , that because "the first four statutory methods for calculating average weekly wage are either inapplicable or would produce a result that is not fair and just to both parties ... the Commission finds that it is appropriate to use the fifth method to calculate average weekly wage." We agree with the Commission's findings.
 

 The Commission, in applying the fifth method, sought to determine a way to produce a result that "most accurately reflects the wages decedent would have continued to earn, but for his diagnosis with mesothelioma, and [that] is fair and just to both parties." The Commission looked at Decedent's earnings for 2012 from his employment with Union County-$4,272.92-which were evidenced by Decedent's Social Security Earnings Statement.
 
 [2]
 
 The Commission then divided this amount by 52 weeks and obtained an average weekly wage of $82.17 with a resulting compensation rate of $54.78 for Decedent. Decedent's Social Security Earnings Statement is competent evidence that supports the Commission's findings, and therefore, we are bound by such findings on appeal.
 

 Plaintiff argues that this calculation of average weekly wages is improper because it does not reflect Decedent's 2012 part-time post-retirement earning capacity. We reject this argument. Section 97-2 explicitly provides that the weekly calculation using the fifth method should "most nearly approximate the amount which the injured employee
 
 would be
 
 earning were it not for the injury[,]" not what the injured employee
 
 could be
 
 earning.
 
 N.C. Gen. Stat. § 97-2
 
 . Because there was evidence in the record of Decedent's actual earnings in the years prior to his diagnosis, the Commission's findings are supported by such evidence, and we affirm the Commission's calculation of Decedent's average weekly wages.
 

 C. Maximum Compensation Rate
 

 It is well established in North Carolina that "it is the duty and responsibility of the full Commission to decide all of the matters
 
 in controversy
 
 between the parties."
 
 Hurley v. Wal-Mart Stores, Inc.
 
 ,
 
 219 N.C. App. 607
 
 , 613,
 
 723 S.E.2d 794
 
 , 797 (2012) (internal quotation marks and citation omitted) (emphasis added). Plaintiff's appeal to the Full Commission challenged the Deputy Commissioner's determination of the maximum compensation rate, but the Commission did not decide that issue. However, the average weekly wage calculated by the Commission fell far below the maximum compensation rate, so that Plaintiff's award was not subject to any limitation by the latter. Because we affirm the Commission's calculation of the average weekly wage, and because the calculated average weekly wage falls far short of any of the argued maximum compensation rates, Plaintiff's appeal of the issue is moot. Accordingly, we dismiss as moot Plaintiff's appeal of the maximum compensation rate.
 

 Conclusion
 

 For the foregoing reasons, we affirm the Commission's finding of fact that Decedent's last injurious exposure to asbestos occurred while Decedent was employed by UPS and we affirm the Commission's recalculation of Decedent's average weekly wage. We dismiss as moot Plaintiff's appeal regarding the determination
 
 *403
 
 of the maximum compensation rate.
 

 AFFIRMED IN PART AND DISMISSED IN PART.
 

 Judges ELMORE and DIETZ concur.
 

 [1]
 

 The Commission correctly notes that "the date of diagnosis" with regard to an occupational disease constitutes the "date of injury[,]" for the purposes of calculating average weekly wages.
 
 See
 

 Pope v. Manville
 
 ,
 
 207 N.C. App. 157
 
 , 168-69,
 
 700 S.E.2d 22
 
 , 30 (2010).
 

 [2]
 

 Decedent's Social Security Earnings Statement includes Decedent's earnings for the years prior to his diagnosis, which indicate a decline in earing from 2008, $9,774.78, to 2012, $4,272.92.